In re TROY & COHOES SHIRT CO.

(District Court, N. D. New York. April 12, 1905.)

No. 1,464.

1. BILLS AND NOTES—ACCOMMODATION INDORSEMENT—KNOWLEDGE.

The president and treasurer of a New York corporation drew certain notes payable to the corporation's order, which they then indorsed, first in the name of the corporation, then with the names of the president and treasurer individually. The notes were then delivered to the corporation's vice president, without consideration, for the benefit of a firm doing an independent business, of which all three were members. The vice president indorsed the notes individually, and then delivered them to the

president of the corporation, who indorsed them, without consideration, in the name of the firm. The firm having a deposit account with claimant in a distant city, an agent of the firm, who was not an indorser, presented the notes to claimant for discount, and on inquiry falsely represented to claimant that the notes had been executed, indorsed, and delivered on account of moneys advanced by the firm to the corporation, whereupon they were discounted on the faith of such representations. *Held*, that the form of the execution and indorsement of such notes was not such as to charge claimant with knowledge that the notes had been executed by the corporation for accommodation, and were therefore unenforceable against it.

**2. SAME.**

The party who discounted the notes knew the president and treasurer of the corporation who made the notes were also members of the firm for whose accommodation the notes were made. *Held*, this fact did not charge the party who discounted the notes with notice of their true character.

In Bankruptcy.

This is the review of an order made by Edwin A. King, as referee in bankruptcy, on the 7th day of January, 1905, disallowing the claim of International Trust Company against the estate of said bankrupt, Troy & Cohoes Shirt Company, for the sum of $25,010.50, presented and proved February 26, 1904. The claim is upon five promissory notes of $5,000 each, made by said Troy & Cohoes Shirt Company, payable to its own order, and indorsed by it and others, and finally discounted by the said International Trust Company. The defense of the trustee sustained by the referee was and is that the maker of the notes received no consideration therefor; that the notes bore upon their face notice that they were accommodation notes; that the making and indorsement was ultra vires; and that said International Trust Company, at the time it discounted the notes, was charged with full knowledge of the invalidity of the notes as against the bankrupt, Troy & Cohoes Shirt Company.

H. D. Bailey, for trustee.
Dillon & Hubbard, for claimant.

RAY, District Judge. To understand the case and the legal principles applicable, it is necessary to fully state the material facts.

(1) The maker of the notes in question, Troy & Cohoes Shirt Company, was, before its bankruptcy, a manufacturing corporation of the state of New York, with its principal place of business at Cohoes, N. Y., engaged in making and selling shirts, etc. Its officers were Frederick Beiermeister, Jr., president, Charles F. Beiermeister, vice president, and John M. Beiermeister, secretary and treasurer. These gentlemen were stockholders in, but not the only ones, and the only directors of the company. The affairs of the company were conducted by them as its board of directors, but no record was kept of their transactions. Section 10 of the general corporation law of the state of New York (Laws 1892, p. 1804, c. 687) provides as follows:

"No corporation shall possess or exercise any corporate powers not given by law or not necessary to the exercise of the powers so given."

The by-laws of the Troy & Cohoes Shirt Company provided as follows:

"No official or agent of this company shall have power to indorse in the name or in behalf of the company any note, bill of exchange, draft, check

or any written instrument for the payment of money, save only for the purpose of collection of said instrument, unless thereunto duly authorized by the vote of the directors of this company duly held at a regular or monthly meeting of the board of directors and entered on the minutes of said board."

"No officers or agents of the company shall singly or together, unless thereto specially authorized, contract or cause to be contracted, any debt or liability in the name or on behalf of the company beyond the ordinary legitimate business and current expenses thereof."

(2) Beiermeister Bros. & Co. was a firm and copartnership at Cohoes, N. Y., carrying on a distinct and separate business from that of the Troy & Cohoes Shirt Company. Such copartnership was composed of said Frederick Beiermeister, Jr., said John M. Beiermeister, and said Charles F. Beiermeister. It had no other member.

(3) Said International Trust Company was and is a corporation of the state of Massachusetts, duly authorized, etc., and was authorized to do and was doing a general banking business. John M. Graham was the president of said company, who did all the business for said company in connection with the discounting of the notes in question. He and said company knew that Frederick, Jr., and John Beiermeister were members of the firm of Beiermeister Bros. & Co. He and said company knew that said Frederick Beiermeister, Jr., was president, and that said John M. Beiermeister was secretary and treasurer, of said Troy & Cohoes Shirt Company. That fact appeared on the face and back of each of the notes in question. The negotiable instruments law of the state of Massachusetts, being chapter 73 of the Revised Laws of said state, contains the following provisions:

"Sec. 46. An accommodation party is one who has signed the instrument as maker, drawer, acceptor or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party."

"Sec. 69. A holder in due course is a holder who has taken the instrument under the following conditions: (1) That it is complete and regular upon its face. (2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored if such was the fact. (3) That he took it in good faith and for value. (4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

"Sec. 73. To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.

"Sec. 74. A holder in due course holds the instrument free from any defect of title or prior parties, and free from defences available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

"Sec. 76. Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who was negotiated the instrument was defective the burden is on the holder to prove that he or some other person under whom he claims acquired the title as holder in due course. But the last mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

(4) On the 10th day of March, 1903, the Troy & Cohoes Shirt Company at Cohoes, N. Y., without consideration, and not for any purpose connected with its own business, and, so far as appears, without any meeting of or action by its board of directors, authorizing such action, made its promissory note of which the following is a copy, viz.:

"$5,000.00                                             March 10th, 1903.

"Six months after date, we promise to pay to the order of ourselves Five Thousand Dollars 00/100, payable at the International Trust Co., Boston, Mass., value received.                     Troy & Cohoes Shirt Co.
                                          "F. Beiermeister Jr. Prest.
                                          "John M. Beiermeister Treas."

The name "Troy & Cohoes Shirt Co." and "F. Beiermeister Jr. Prest." were signed thereto by the president, and "John M. Beiermeister Treas." was signed thereto by such treasurer. Said note was thereupon and without consideration indorsed as follows: Said president of said company first wrote the name of said company on the back thereof, and his own name with the word "Prest." following, thereunder, and then said treasurer wrote his name under the name of the president, adding "Treas." Said F. Beiermeister, Jr., and said John M. Beiermeister then indorsed said note individually by writing their names in the order named thereunder. The said note, without consideration, was then delivered to said Charles F. Beiermeister, vice president of said shirt company, and also a member of the firm of Beiermeister Bros. & Co., who indorsed said note by writing his name thereon as follows: "C. F. Beiermeister," and said note was then delivered to said F. Beiermeister, Jr. (a member of said last-named company, the copartnership, and also president of said shirt company), who indorsed same, without consideration, by writing the name of such copartnership thereon as follows: "Beiermeister Bros. & Co." Such indorsements then read as follows and in the following order, viz.:

"Troy & Cohoes Shirt Co.
"F. Biermeister Jr., Prest.
"John M. Beiermeister Treas.
"F. Beiermeister Jr.
"John M. Beiermeister.
"C. F. Beiermeister.
"Beiermeister Bros. & Co."

The note was not made or given for an advance or advances made, or any consideration whatever given or paid, by any one or more of such indorsers.

(5) The Troy & Cohoes Shirt Company was not indebted to said partnership, nor to said F. Beiermeister, Jr., but said partnership and said F. Beiermeister, Jr., each were indebted to Troy & Cohoes Shirt Company.

(6) Beiermeister Bros. & Co. had an account with said International Trust Company, from which it drew money on check from time to time.

(7) Henry Beiermeister was the agent of said firm Beiermeister Bros & Co.

(8) On the day of the date of the said note, March 10, 1903, said agent of said copartnership, known and representing himself to be such agent, presented the said note to said International Trust Company at its place of business in Boston, Mass., the place where payable, for discount, and he then and there stated and represented to the said International Trust Company, and directly to its said president, John M. Graham, who was doing the business for said trust company, that such note was made, executed, indorsed, and delivered on account of advances of money made by said Beiermeister Bros. & Co. to the said Troy & Cohoes Shirt Company. The said International Trust Company, so represented by its president in the transaction, believed such representations, and thereupon discounted such note for, and placed the proceeds thereof to the credit of, the firm of Beiermeister Bros. & Co. No part of such proceeds was paid to or for the benefit or use of the maker, Troy & Cohoes Shirt Company. It is not shown that the directors of said company, acting as a board, authorized the making, execution, indorsement, and delivery of said note.

(9) The other four notes, each for $5,000, and reading the same, except as to date, were made, executed, indorsed, delivered, and discounted in precisely the same manner, by the same persons and companies, and under the same circumstances, and with the same representations, and the proceeds were placed to the credit of the same firm, as in the case of the note of March 10, 1903, the only difference being in the dates of the notes and of the transactions relating thereto, viz., one was dated and discounted April 3, 1903, two May 21, 1903, and the last May 29, 1903.

From these facts it appears that the International Trust Company knew, when it discounted these notes, that Troy & Cohoes Shirt Company, the maker, was a New York corporation; that Frederick Beiermeister, Jr., and John M. Beiermeister were the president and secretary and treasurer thereof, respectively; and that such named persons were members of the firm of Beiermeister Bros. & Co., a firm carrying on a separate and an independent business. From these facts the referee has found as a fact "that the notes in question bore upon their face and in their indorsement, when presented for discount by said firm of Beiermeister Bros. & Co. to the International Trust Company of Boston, notice that they were accommodation notes." Such referee has also found from the aforesaid facts "that said notes in question bore upon their face and in their indorsements, when presented for discount by Beiermeister Bros. & Co. to International Trust Company of Boston, notice that they were ultra vires and void as obligations of Troy & Cohoes Shirt Company." The referee also finds as a fact "that the claimant (International Trust Company) has failed to prove any loan of moneys to Troy & Cohoes Shirt Company, as alleged in its proof of claim." The proof of claim in due form, and properly verified, states that "the said Troy & Cohoes Shirt Company * * * was at and before the filing of the said petition, and still is, justly and truly indebted to said corporation (International Trust Company) in the sum of twenty-five thousand ten and $^{50}/_{100}$ (25,010.50) dollars; that the

consideration of said debt is as follows: money loaned as per notes attached." The claim then says that no part of said note has been paid, no note received, and no judgment rendered, and that there are no set-offs or counterclaims, except $534.72. The original notes, with certificates of protest attached, were annexed to the claim.

I do not see the pertinency or correctness of a finding "that the claimant has failed to prove any loan of moneys to Troy & Cohoes Shirt Company, as alleged in its proof of claim." The International Trust Company has neither stated nor suggested in its proof of claim that it did loan money to the Troy & Cohoes Shirt Company. It simply makes a claim upon the notes, with the statement that the consideration was money loaned as per notes attached, and as the last indorser upon each of said notes is Beiermeister Bros. & Co., the fair inference is that the money was loaned to this indorser, and not to the maker of the note.

The trustee insists that the making, execution, indorsement, and delivery of these notes were not the exercise of a power given by law, or, if given by law, such acts were not necessary to the exercise of the power given. The contention is that the Troy & Cohoes Shirt Company had power under the statute to give notes in the transaction of its business for money borrowed to use in its business, or in payment for property purchased, or for labor only, and that it had no power to make an accommodation note in this form, and indorse it in this form to a second party, and that the want of power to make this note appears upon the face thereof by reason of the fact that it is made by the maker payable to itself. It is also contended that under the by-laws quoted each note is void, for the reason that it does not affirmatively appear that the indorsement of such note by the president and treasurer was authorized by the vote of the directors at a regular or monthly meeting entered on the minutes of the board. It is further contended that each note is void because executed, indorsed, and delivered in violation of the by-law prohibiting the officers, unless specially authorized, from contracting any debt or liability in the name or on behalf of the company beyond the ordinary legitimate business and current expenses of the company. It is insisted that the International Trust Company of Boston was bound to know the powers of this company, the Troy & Cohoes Shirt Company. The trustee insists that each note showed to the International Trust Company upon its face that it was made and indorsed in the name of the company, by its officers, who were seeking to use such note for their own personal ends, and that the form of the note and of its indorsements were sufficient to put said trust company upon inquiry as to the power of the maker to utter such note, as to its consideration, and as to all other material facts. The trustee further claims that, as the International Trust Company was thus put upon inquiry, and failed to inquire further than it did, it stands charged with knowledge of all the material facts hereinbefore cited, and is as fully concluded and bound as though it had possessed actual knowledge when the paper was discounted.

The International Trust Company took these notes from the duly authorized agent of one of its customers, Beiermeister Bros. & Co. It would seem that it made inquiry, for it was informed that the note was made, indorsed, and delivered to the Beiermeister Bros. & Co. for advances made by that company to the maker of the note. It is not the case of a note made by a company payable to itself, and indorsed to an officer of the company, and by such officer discounted for his own benefit to the knowledge of the discounter. Here, while the note is made payable to the order of the maker, and was then indorsed by the maker exactly as signed, and also by the president and secretary and treasurer of the maker individually, it also bore the indorsement of C. F. Beiermeister. There is no evidence that the International Trust Company knew C. F. Beiermeister held an official position in, or had anything to do with, the Troy & Cohoes Shirt Company. There is no evidence that the president of the Troy & Cohoes Shirt Company, or the treasurer thereof, made or used or indorsed the notes for their individual benefit. In fact, they did not. The notes were made and indorsed as they were for the benefit of Beiermeister Bros. & Co., a copartnership doing an independent business. It is probably true that, had either the president or secretary and treasurer taken these notes, indorsed as they were, to the International Trust Company for discount with the statement that he desired the money for his own purposes, or that he was procuring the discount for himself, and not for the maker, this would have been notice to the International Trust Company of the invalidity of the notes; but the notes were not presented for discount by any officer of the maker. On the other hand, each note was presented on the day of its date by an agent, not of Frederick Beiermeister, Jr., or of John M. Beiermeister, but of an independent company, doing an independent business, who sought to discount the note for the benefit of this independent company. The International Trust Company possibly had cause to suspect that the notes had been made and used for the benefit of either the president or secretary and treasurer, or both, inasmuch as such notes bore their individual indorsements, and hence it made inquiry, and was informed, in substance and effect, that the individual indorsements of Frederick, Jr., John M., and C. F. Beiermeister were accommodation indorsements, made to add their individual liability to the liability of the Troy & Cohoes Shirt Company, and that such notes were given for advances made by Beiermeister Bros. & Co. to the maker of the note.

In Wilson v. the Metropolitan E. R. Co., 120 N. Y. 145, the court says at page 150, 24 N. E. at page 385 (17 Am. St. Rep. 625):

"Undoubtedly the general rule is that one who receives from an officer of a corporation the notes or securities of such corporation in payment of, or as security for, a personal debt of such officer, does so at his own peril. Prima facie, the act is unlawful, and, unless actually authorized, the purchaser will be deemed to have taken them with notice of the rights of the corporation. Garrard v. P. & C. R. R. Co., 29 Pa. 154; Pendleton v. Fay, 2 Paige, 202; Shaw v. Spencer, 100 Mass. 388, 97 Am. Dec. 107, 1 Am. Rep. 115."

The cashier of a bank is not presumed to have power to bind it as an accommodation indorser on his individual note, and the payee cannot, unless he proves authority to make the indorsement, recover against the bank. West St. Louis Bank v. Shawnee Bank, 95 U. S. 557, 24 L. Ed. 490. It is conceded that such are the rules. But here, as already stated, the notes were not presented for discount by an officer of the Troy & Cohoes Shirt Company, or his agent, or for discount in payment of a debt of such an officer, or for the benefit of such an officer, but by the agent of an independent business company, which was carrying on a business independently of such shirt company. It was payable to the order of the maker, but this was not a suspicious circumstance.

In Collins v. Gilbert, 94 U. S. 753, 24 L. Ed. 170, the draft in question for $8,000 was drawn by P. F. Collins & Co. on Thomas Collins to their own order, and by them indorsed in blank, and without consideration accepted by said Thomas Collins. Thomas Collins was not a member of the firm. P. F. Collins & Co., having possession of the accepted draft, delivered it to one Barnes, a contractor, with whom P. F. Collins & Co. were subcontractors. Barnes discounted the draft with Gilbert & Gay, the plaintiffs. It was held that this draft, although payable to the order of the drawer, carried no notice of any defect. The headnotes are:

"(1) A negotiable instrument, payable to bearer, or indorsed in blank, produced by a transferee suing to recover its contents, is, when received in evidence, clothed with the prima facie presumption that he became the holder of it for value at its date in the usual course of business, without notice of any thing to impeach his title.

"(2) The title of a bona fide holder for value of an accepted draft, indorsed in blank, is not affected by the fact that the party from whom he received it before its maturity had possession of it for certain purposes, and misappropriated it."

And in that case, at page 758 of 94 U. S. (24 L. Ed. 170) the court said:

"Where the supposed defect or infirmity in the title of the instrument appears on its face at the time of the transfer, the question whether the party who took it had notice or not is, in general, a question of construction, and must be determined by the court as matter of law. Andrews v. Pond, 13 Pet. 65 [10 L. Ed. 61]; Fowler v. Brantly, 14 Pet. 318 [10 L. Ed. 473]; Brown v. Davis, 3 T. R. 86."

In the Chemical National Bank v. Colwell (Sup.) 9 N. Y. Supp. 285, a note of the New York Lumber Company was drawn to its own order and indorsed exactly as signed. It was presented for discount by a director 20 days after made. The director who discounted the note in fact used the proceeds for his own benefit, but the bank did not know this fact. It was held that:

"The fact that Jones was a director of the company, and that the proceeds of the note were applied by him to his own use, does not show that the note was made for his accommodation, nor did the possession of the note by him naturally give rise to the question as to whether he was not confederating with the president of the company to make an improper use of the credit and the paper of the company. The note was signed: 'New York Lumber Company, Limited, D. C. Wheeler, Pres.,' and was drawn to the order of

'New York Lumber Co., Lim.,' and it was indorsed exactly as it was signed. Such a note, so indorsed, though presented for discount by a director of the company twenty days after it bore date, did not, upon its face, suggest that it was an accommodation note; nor did the possession of it by a director argue that it was used for a dishonest purpose. If, in point of fact, the proceeds of the note went into the company business; or if the note, after having been used in the business of the company, had found its way into the hands of a director (and the bank had nothing before it to show that either state of affairs was unlikely), what reason was there why it should not be discounted?"

The second headnote is as follows:

"A note of such company, drawn to its own order, and signed and indorsed by the president when presented for discount, although so presented by a director some time after its date, does not, on its face, suggest that it was an accommodation note, nor does the possession of it by the director tend to show that it was used for a dishonest purpose."

It is well settled that the fact that a note is presented for discount by the maker is notice to the institution making the discount that the indorsement thereon is an accommodation indorsement. National Park Bank of New York v. Remsen (C. C.) 43 Fed. 226; The Bank of the Monongahela Valley v. Weston et al., 159 N. Y. 201, 54 N. E. 40, 45 L. R. A. 547; Smith v. Weston et al., 159 N. Y. 194, 54 N. E. 38.

In the Bank of the Monongahela Valley v. Weston et al., 159 N. Y. 201, 54 N. E. 40, 45 L. R. A. 547, it was held:

"When a promissory note was not received by the holder from any party prior in order of liability or possession to the indorser, it is not within the rule that when a note is presented by the maker the purchaser has, from that fact, notice that the indorsements were not made in the ordinary course of business."

In Cheever v. The Pittsburg, Shenango & Lake Erie Railroad Company, 150 N. Y. 59, 44 N. E. 701, 34 L. R. A. 69, 55 Am. St. Rep. 646, the first three headnotes are as follows:

"The rights of a holder of wrongfully diverted negotiable paper, acquired by him for value before due, cannot be defeated without proof of actual notice of the defect in title, or bad faith on his part, evidenced by circumstances."

"One who takes negotiable paper for value before due, without actual notice of any defect therein, has the right to assume that the relations to the paper of every party whose name appears on it are precisely what they appear to be."

"The principle that, where an officer or agent of a corporation makes a corporate obligation payable to himself, it bears upon its face sufficient notice of his incapacity to issue it, when he attempts to deal with it for his own benefit, does not apply where an officer or agent deals with a corporate note, executed by himself as such officer or agent, but originally payable to a third party, and which, so far as appears upon its face, has been regularly issued to the original payee, and by him transferred to a firm of which the officer is a member, and for which he acted in dealing with the note."

In that case the railroad company, by its president and secretary, made its note dated February 24, 1888, in the words and figures following, with the indorsements appearing thereon when same was discounted:

$5,000. Greenville, Pa., Feb'y., 24th, 1888.

"Four months after date the Pittsburg, Shenango and Lake Erie Railroad Company promises to pay to the order of John T. Bruen five thousand dollars, at the American Exchange National Bank, New York City.

"Value received.

"The Pittsburg, Shenango & Lake Erie Railroad Company.

"By M. S. Frost, President.

"Attest:

"E. S. Templeton, Secretary."

"Indorsed:

"Pay to the order of M. S. Frost & Son. John T. Bruen,

"M. S. Frost & Son."

The note and name of the corporation signed thereto was in the handwriting of Templeton, the secretary. The president signed his own name. The indorsers signed their own names in the order appearing. Bruen was the private secretary of M. S. Frost, the president. M. S. Frost was a member of the firm of M. S. Frost & Son, the last indorser. There was no consideration for the making of the note, and Bruen, the payee, had no interest whatever in it. He indorsed it because requested to do so by Frost, the president. M. S. Frost & Son paid nothing for the note, and there was no consideration for the indorsement of that company. One Brooks, of Boston, had business with Frost, and in March, 1888, took the note of M. S. Frost & Son for $30,000 as security for a loan of that amount. Frost gave Brooks, as collateral security for said $30,-000 note, certain certificates representing bonds, and also this note in question and another of the same character. Brooks held these notes as collateral merely until long after they were due, when he became the absolute owner through the foreclosure of his collateral. Thereafter Brooks transferred them to the plaintiff. It is perfectly plain that in this case Frost, the president of the company, fraudulently diverted the note of the corporation to his own use. Brooks knew that Frost was the president of the corporation, the maker of the note; and he also knew that Frost, the president of the corporation, was a member of the firm of M. S. Frost & Son. He therefore knew that M. S. Frost, who had made the note of the corporation as president, had probably passed it first to Bruen, and that then it had come to the firm or company of which said Frost was a member, M. S. Frost & Son. These facts appeared upon the note itself when Brooks took it. Brooks knew that the president of the company was using this note, thus indorsed, for the benefit of M. S. Frost & Son, and to an extent, therefore, for his own individual benefit. Brooks in fact had no actual knowledge of the facts surrounding the origin of the note, or of the diversion of it by the president. The court said as to the knowledge of Brooks:

"He knew nothing, so far as appears, outside of the paper itself, except the fact that the party presenting it was defendant's president, and that he was proposing to pledge the notes for his own debt, or rather for the debt of his firm, which, for all the purposes of the question, may be assumed to be the same thing. The question in the case is therefore reduced to a very narrow inquiry, and that is whether Brooks, standing in all other respects in the position and sustaining the character of a bona fide purchaser of negotiable paper, is deprived of that character and the benefits of that posi-

tion by reason of anything appearing upon the face of the notes themselves. The mind, at the threshold of the inquiry, encounters two principles that point in opposite directions and lead to different conclusions, as the one or the other is allowed to preponderate in the mental process of determining the legal rights of the parties. On the one hand is the principle which protects a bona fide holder of commercial paper from existing antecedent equities between the parties, and on the other the principle which protects a corporation from the unauthorized and fraudulent acts of its own officers. There is not much difficulty in stating the rule of law defining the duties and obligations of a party to whom negotiable paper is presented for discount or sale before due. He is not bound at his peril to be on the alert for circumstances which might possibly excite the suspicion of wary vigilance. He does not owe to the party who puts the paper afloat the duty of active inquiry in order to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence. The holder's rights cannot be defected without proof of actual notice of the defect in title or bad faith on his part, evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted mala fide, his title, according to settled doctrine, will prevail. Magee v. Badger, 34 N. Y. 249, 90 Am. Dec. 691; Am. Ex. Nat. Bank v. N. Y. Belting, etc., Co., 148 N. Y. 705, 43 N. E. 168; Knox v. Eden Musee Am. Co., 148 N. Y. 454, 42 N. E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 700; Canajoharie Nat. Bank v. Diefendorf, 123 N. Y. 202, 25 N. E. 402, 10 L. R. A. 676; Vosburgh v. Diefendorf, 119 N. Y. 357, 23 N. E. 801, 16 Am. St. Rep. 836; Jarvis v. Manhattan Beach Co., 148 N. Y. 652, 43 N. E. 68, 31 L. R. A. 776, 51 Am. St. Rep. 727. Applying these rules to the conceded facts of the case, it seems to me to be impossible to impute bad faith to Brooks in the transaction. He advanced a large sum of money on the faith of the paper, without any actual knowledge that the relations of the party with whom he dealt to the paper were different from what they appeared to be on the face of it. The question now is, not what the facts were, but what they appeared to be, and what he had the right, from the notes themselves, to assume. He had the right to assume that the relations to the paper of every party whose name appeared on it were precisely what they appeared to be. Hoge v. Lansing, 35 N. Y. 136. He had the right to believe that the notes had been issued by the defendant to Bruen for value, in the regular course of business, and were by him transferred to Frost & Son in like manner. There was nothing to suggest to him that Frost was dealing with paper that belonged to the railroad for his own benefit. The appearances were that the defendant had put the notes in circulation by delivery to Bruen, and that they came to Frost's firm in the regular course of business, for value, and were then the property of the firm. It is quite true that all these appearances were deceptive, and that the actual facts were otherwise. But how was a banker or business man in Boston to know or suspect that Bruen was only the nominal payee and a mere instrument in the transaction to enable the president to divert the paper to his own use? The name of the party who presented it and had it in his possession appeared on the face of the paper to have signed it as president. The name of another officer of the corporation was upon it also, attesting its regularity, and everything was in his handwriting except the signature of the president and the indorsement of the payee. So far as Brooks was concerned, the paper showed that it had been issued to a stranger in the regular course of business, and, through his indorsement, had come to the hands of a mercantile firm of which the president of the corporation was a member. If this were the fact, there is no doubt as to his right to use it in the business of the firm. The holder of a note who has no actual knowledge or notice of a defect in the title, or other equities between the parties, when circumstances come to his knowledge sufficient to put him upon inquiry, is chargeable with knowledge of all the facts that such inquiry would have revealed. The difficulty in this case is to find the circumstance which can be said to be sufficient to put Brooks upon the inquiry. There was absolutely nothing on the face of the paper except the signature, as

president, of the party who was dealing with it; and that, we think, was not sufficient, in view of the fact that the appearances were that he was a purchaser from a third party. The principle that applies in a case where an officer of a corporation makes the corporate obligation payable to himself, and then attempts to deal with it for his own benefit, does not aid in solving the question in this case. When paper of that character is presented by the officer or agent of the corporation, it bears upon its face sufficient notice of the incapacity of the officer or agent to issue it. Hanover Bank v. Am. Dock & T. Co., 148 N. Y. 612, 43 N. E. 72, 51 Am. St. Rep. 721; Bank of N. Y., etc., v. Am. Dock & T. Co., 143 N. Y. 559, 38 N. E. 713; Wilson v. M. E. R. Co., 120 N. Y. 145, 24 N. E. 384, 17 Am. St. Rep. 625; Gerard v. Mc-Cormick, 130 N. Y. 261, 29 N. E. 115, 14 L. R. A. 234. There are numerous cases that belong to that class cited by the learned counsel for the defendant on his brief. There is a manifest distinction between them and the case at bar. Here the officer was not dealing with the corporate notes payable to himself, but with notes that had been regularly issued, so far as appeared from their face, to a stranger, and by him transferred to a firm of which the officer was a member, and for which he acted as agent in procuring the loan from Brooks and pledging them as security. The presence of Frost's name upon the paper as one of the agents who issued it was not naturally or reasonably calculated, under the circumstances, to arouse suspicion in the mind of Brooks, or to lead him to believe that the president was attempting to defraud the corporation in disposing of the notes. None of the cases cited by the learned counsel for the defendant sustain the proposition that such a circumstance is sufficient to put the purchaser of negotiable paper upon inquiry, or charge him with knowledge of the fact in case he fails to make it, and there are many cases that tend to support the contrary view. Am. Ex. Nat. Bank v. N. Y. B. & P. Co., 148 N. Y. 698, 43 N. E. 168; Miller v. Consolidation Bank, 48 Pa. 514, 88 Am. Dec. 475; Walker v. Kee, 14 S. C. 142."

It would seem that in the case at bar the question is reduced to this: Was the fact that the notes in question were indorsed by the maker, Troy & Cohoes Shirt Company, by its president and treasurer and secretary, to such president, Frederick Beiermeister, Jr., individually, and by him to the secretary and treasurer, John M. Beiermeister, individually, and by him to C. F. Beiermeister, and by him to Beiermeister Bros. & Co., such notice of defect of title as to charge the International Trust Company with notice of the fact that this was an accommodation note, or with notice of the fact that Beiermeister Bros. & Co. had no title or right to have same discounted, notwithstanding the fact that the agent of Beiermeister Bros. & Co. stated to the trust company, when the discount was made, that the notes were given by the maker for advances? In other words, did the indorsements give notice to the trust company of the fact that in the hands of Beiermeister Bros. & Co. the notes were invalid and uncollectible? This would seem to depend upon two questions, viz.: Did the indorsement by the Troy & Cohoes Shirt Company to Frederick Beiermeister, Jr., individually, show or indicate that he had used or was using such notes or their proceeds for his own individual benefit, or did this indorsement to him and his indorsement to John M. Beiermeister show or indicate that they together had used the note or its proceeds for their individual benefit or purposes, and, if so, was the discounter, International Trust Company, thus put upon inquiry, protected in accepting and relying upon the statement of the agent of Beiermeister Bros. & Co. that the notes were given for advances made by his firm to the maker?

Was there any presumption arising from the fact that the notes were indorsed by the maker, and then by its president and treasurer individually, that such officers, without full consideration to the maker, received and applied the notes or their proceeds to their individual use or purposes? If so, then the officers of a corporation who execute a corporate note for legitimate purposes cannot, for the benefit or security of a bank discounting such note, add their individual indorsements without thereby admitting that they are violating their duty as such officers and misappropriating or misapplying the note of the corporation or its proceeds. I am not aware of the existence of such a rule of law. The rule, as stated in Wilson v. Metropolitan E. R. Co., 120 N. Y. 150, 24 N. E. 384, 17 Am. St. Rep. 625, and cases there cited, negatives this idea, for it is said:

"One who receives from an officer of a corporation the notes or securities of such corporation in payment of or as security for a personal debt of such officer does so at his own peril."

It seems to be the knowledge that the officer of the corporation is using the note for his own personal benefit that gives the notice, not the fact of the indorsement of the note or obligation by such officer. It would seem unreasonable to assume that the officer has diverted the note of the corporation to his own personal use because he indorses it. In Garrard v. Pittsburgh & Connelsville Railroad Company, 29 Pa. 159, the court said:

"But when he took it as collateral security for an individual debt of the president, he became a party to the misapplication and the breach of trust. * * * As a general rule, when the chief officer of a corporation is found in possession of its securities, his possession must be presumed to be the possession of the corporation."

In Shaw v. Spencer et al., 100 Mass. 382, 97 Am. Dec. 107, 1 Am. Rep. 115, held:

"One holding stock as trustee has prima facie no right to pledge it to secure his own debt growing out of a transaction independent of the trust. If a certificate of stock expressed in the name of 'A. B., trustee,' is by him pledged to secure his own debt, the pledgee is by the terms of the certificate put on inquiry as to the character and limitations of the trust, and, if he accepts the pledge without inquiry, does so at his peril."

But here, even if such indorsements gave rise to suspicion, this was not enough to charge the International Trust Company with actual knowledge on the theory that upon inquiry it would have obtained knowledge of all the facts. Nor is the claimant here chargeable with bad faith. Am. Ex. Nat. Bank v. N. Y. Belting, etc., Co., 148 N. Y. 698, 43 N. E. 168:

"Where it is sought to defeat the right of the holder of negotiable paper before maturity to recover against the maker, it is essential that actual notice be proved of the defect in title, or that circumstances be shown evidencing bad faith in the holder, and creating reasonable grounds for suspecting his conduct in the transaction. A bank has a right to assume, as to notes offered to it, whether for discount or as collateral security, by a customer who has an account with it, and who is in the habit of borrowing money from it, that the customer is acting in good faith, and within his lawful rights; and the fact that the customer is engaged in the business of note brokerage is not enough to deprive the bank of the right to indulge in such assumption."

In Goetz v. Bank of Kansas City, 119 U. S. 551, 7 Sup. Ct. 318, 30 L. Ed. 515, it was held:

"The bad faith in the taker of negotiable paper which will defeat a recovery by him must be something more than a failure to inquire into the consideration upon which it was made or accepted, because of rumors or general reputation as to the bad character of the maker or drawer."

In Hart v. Potter, 4 Duer, 458, it was held:

"When it appears that a promissory note, made for the accommodation of the payee, was obtained from the payee by fraud, the holder is bound to prove that it was transferred to him for value, and before its maturity. He is not, however, bound to prove, in addition, that he had no notice of the fraud when the note was transferred to him, but the burden of proving facts sufficient to charge him with notice rests upon the defendant."

In Tod et al. v. Kentucky Union L. Co. et al. (C. C.) 57 Fed., at page 52, the court said:

"When a corporation has power to issue bonds or execute promissory notes, it will be liable upon accommodation paper, though ultra vires, if such paper comes to the hands of a bona fide holder for value, without notice. Such a holder will be entitled to stand upon the presumption that the paper was executed for value, and for a lawful purpose. Mor. Priv. Corp. § 597; Monument Nat. Bank v. Globe Works, 101 Mass. 57, 3 Am. Rep. 322; Mechanics' Banking Ass'n v. New York & S. White Lead Co., 35 N. Y. 505. The principle has been thus stated: 'Where a corporation has power, under any circumstances, to issue negotiable securities, the bona fide holder has a right to presume that they were issued under circumstances which give the requisite authority, and that they are no more liable to be impeached for any infirmity, in the hands of such a holder, than any other commercial paper.' City of Lexington v. Butler, 14 Wall. 296, 20 L. Ed. 809."

In 3 Cook on Corporations (5th Ed.) § 761, p. 1978, it is said:

"A bona fide purchaser of the corporate note is protected as he would be if the maker were an individual, excepting where he takes the note from an officer of the corporation in connection with the officer's personal business matters."

In 1 Cook on Corporations (5th Ed.) § 293, p. 640, it is said:

"It is well established that a person dealing with an officer of a corporation in a matter in which the officer is personally interested is not a bona fide holder of corporate securities received by him from the officer in that transaction. He is bound to inquire into the legality of any stock or corporate note which such officer issues or transfers to him in the officer's personal business, and is chargeable with notice of illegalities in the issue."

In Nat. Park Bank of N. Y. v. The German American M. W. & S. Co., 116 N. Y. 281, 22 N. E. 567, 5 L. R. A. 673, it was held:

"Where the maker of a promissory note made payable to his order, and purporting to be indorsed by such a corporation, procures it to be discounted for his own benefit, if unexplained, this is notice to the discounter that the indorsement is not made in the usual course of business, but is for the accommodation of the maker."

In Hotchkiss v. National Banks, 21 Wall. 354, 22 L. Ed. 645, it was held:

"The title of a person who takes negotiable paper before due for a valuable consideration can only be defeated by showing bad faith in him, which implies guilty knowledge or willful ignorance of the facts impairing the title of the party from whom he received it; and the burden of proof lies on the assailant of the taker's title."

In Richmond R. & E. Co. v. Dick et al., 52 Fed. 379, 3 C. C. A. 149, it was held:

"A manufacturing corporation received negotiable notes for property sold. The notes were discounted by a banking firm, in which the president of the corporation was a partner, but he had no actual knowledge as to the consideration for the notes, or of the transaction in which they were given. Held, that the mere fact of his connection with the two concerns was not sufficient to affect the banking firm with constructive notice of the consideration for the notes and of an alleged failure thereof."

In Atlas Nat. Bank v. Holm et al., 71 Fed. 489, 19 C. C. A. 94, it was held:

"In order to deprive one of the character of a bona fide purchaser, it is not enough that he neglected to make the inquiry which a prudent man would or ought to have made, but he must have acted in bad faith. There is no presumption that a purchaser of a note was aware of existing defenses thereto."

There are many cases bearing on this question pro and con. After a careful examination of all the cases cited, and of many others, I have arrived at the conclusion that the facts appearing upon each note itself, including the indorsements, together with the knowledge possessed by the International Trust Company of Boston as to the interest of the president and treasurer of the maker of the note in the firm which presented such note for discount, were not sufficient to charge such trust company with knowledge of the facts as to the making of such note, the want of consideration, etc. While it appears that the trust company knew that Frederick, Jr., and John M. were members of the firm which presented the note for discount, it does not appear that it knew, or had reason to believe, that they were the only members of such firm, or the controlling members therein. As this firm was doing an independent business, the fact that the two Beiermeisters last mentioned were members not only of the corporation making the note but of the firm presenting such note for discount was not notice, nor a fact tending to give notice, that the corporate note was made and being used for the accommodation of the firm. Cheever v. The Pittsburg, Shenango & Lake Erie R. Co., supra; Richmond R. & E. Co. v. Dick et al., supra.

These notes were presented for discount by a customer of the trust company at its banking house in Boston, Mass. The agent of the company presenting the notes stated that they were made and delivered to his principal for advances made. There was nothing upon the notes or in the facts known to the trust company indicating that such was not the fact. If such notes were given by the corporation to the company for advances made, it was not suspicious, or a cause for further inquiry, that they bore the individual indorsements of the Beiermeisters. It well might be that such indorsements were made for the accommodation of the corporation. It is true that the notes were offered for discount at a long distance from Cohoes, N. Y. It was not stated that the advances for which the notes were given were made that day. The advances might have been made some days before the notes were

given. There was nothing improbable in this, in view of the fact that Frederick, Jr., and John M. Beiermeister were members both of the corporation and of the firm.

It is not suggested that the International Trust Company did not pay full value for these notes. The money was placed to the credit of the firm of Beiermeister Bros. & Co., and checked out by it in due course of business.

This court is of the opinion that it was error to reject the claim of the International Trust Company upon these notes. The order of the referee is reversed, with directions to allow the claim as presented.